24-936 Good morning, Your Honors. May it please the Court. This is a case about an individual who had no history of mental illness, who went to Stony Brook Medical Center with chest pains, made an innocuous comment about her frustrations dealing with a very poor health condition. She had a very painful medical disorder and found herself involuntarily hospitalized for six days. She filed a civil rights action challenging the actions of defendants. The district court granted summary judgment after it struck the plaintiff's affidavit and the affidavit of the plaintiff's expert, striking the plaintiff's affidavit under a rule that a non-moving party cannot create issues of fact in a summary judgment motion by submitting an affidavit that contradicts her deposition testimony. However, the court made no attempt whatsoever to compare the plaintiff's affidavit testimony with her deposition testimony. Once you recognize that the plaintiff's affidavit should not be struck, there are three cases that make clear that the plaintiff is entitled to go to trial and a summary judgment motion should not have been granted. Counsel, it's my understanding that your client in the deposition, even in the post-summary judgment sort of post-discovery affidavit, admitted making statements like, I don't want to live, statements that suggested suicidal ideation. Absolutely not. She made no statement. In both her deposition and her affidavit, she was abundantly clear that she never had a suicidal thought. I thought, while plaintiff does not deny the Stony Brook ED doctor documented that she wanted to take her life, she denies that she ever wanted to do so. But that's not really a denial. My understanding is, well, I didn't mean it. She's trying to give explanations for the statements that were made. No. And I can point out on the appellee's argument, I'll go to her affidavit and point out, but she was abundantly clear in both her deposition and her affidavit. Well, let me give some examples of statements that I thought of as being along these lines that she didn't deny. And I take it she explains that what she meant by them was not that she intended to commit suicide. But she acknowledges she said things like, I don't know how people live with such pain in the face.  That she no longer enjoyed the activities that she previously enjoyed. Your Honor, I'm sorry, but she never said that. And she denied saying that. Okay. I thought that she didn't deny that she made those statements, but she asserted that she cried from frustration and pain from her health condition. And that when she said she went straight to bed, she meant she would take a nap after work. Yes. Well, the latter, she acknowledged that she would come home, take a nap, and then go back to all her regular activities. That's different than what the defendant asserted in the medical record, which was she went home and went straight to bed. As for her crime, she said she was weeping because she found herself near midnight trapped in a psychiatric emergency room when 12 hours earlier she had gone in for chest pains. And I guess the other one that left out of me is that she didn't want to be a burden to others. She acknowledged she made that statement, but she had a different meaning than the doctors took from it. Sure. Right. And, yes, what she meant was she felt bad having her husband taking her to medical appointments. That's hardly indicative of suicide. So one of the things that's tricky here is the standard we're looking – the doctors are implementing is a probable cause standard. Yes. And so it's sort of like when a search warrant or an arrest warrant is executed and it turns out the person is not guilty or there's nothing to be found. The standard is what it is. And so those doctors in that moment don't have the benefit of hindsight of her explanation. I respectfully disagree, Your Honor, because the plaintiff put forth an expert affidavit that said standards of practice require a psychiatrist to question or conduct an examination of the patient. Okay. So that's a slightly different argument. That's this – I think that's the argument about not spending enough time and doing enough with her. But if the statement is, I don't know how people live with this kind of pain, we can now understand, we can accept her statement that what she meant was, you know, sort of, you know, that this is really terrible. And instead of saying I'm having trouble coping with it or the fact that people – I don't know how she could have phrased that. It's a terrible thing I'm dealing with. And that in retrospect, we can accept her explanation that she didn't mean that, that I don't know how people live with this and so therefore I'm not going to live anymore. But – I'm sorry, Your Honor. She never said I'm never going to live anymore or I don't want to live anymore or any of that. I understand. But how is the doctor in the moment – and this is a tricky – you know, I don't think this is a clear-cut – I don't think this is a clear-cut answer. But it is tricky in the moment when the standard being applied is probable cause to understand how we should view that statement and some like it. I'm having trouble sleeping, which I think is undisputed, whether it's waking up every two hours or only sleeping for two hours. I have lost a bunch of weight, whether it's five to six pounds because her mouth hurts or 12 pounds because she's depressed. But I've lost a bunch of weight. I'm having trouble sleeping. I don't know how people live like this. Yes, the answer, Your Honor, is to sit down with the patient and conduct an evaluation and gather an explanation for all of this. If you look at the record in granting all inferences in favor of the plaintiff, as you should, a decision – Dr. Mustafa made the decision after consulting with the resident to involuntarily hospitalize the plaintiff at 9.30 that evening when she went to Stony Brook. The plaintiff testified in both her deposition and her affidavit that Dr. Mustafa did not see her till 11 o'clock. That means a decision was made to lock someone up in a psychiatric hospital without ever speaking to the plaintiff. And I respectfully suggest that an individual's liberty warrants more than simply looking at the record, particularly when the expert's affidavit said medical standards require such an evaluation. And by not evaluating her or even evaluating her for 10 minutes, Dr. Mustafa substantially departed from professional standards. What about the other two doctors at the psychiatric facility, Dr. Uno? I'm going to mispronounce it. We can call him Dr. O. So my apologies to the doctor, but Uno and –  What about – I mean, there were further evaluations done while she was hospitalized for five days and assessments made. I respectfully suggest those arguments, those evaluations were a sham. The plaintiff testified, again, very consistently between her affidavit and deposition that she walked in to see Dr. O. He spent no more than ten minutes with her, looked at her once. Five of those minutes were taken talking about the plaintiff's desire to leave the hospital by writing a letter. So your position is the psychiatric evaluations conducted after she's transferred to the psychiatric facility, where there are evaluations of, I guess, 90 and above is normal, 30. The initial was 30, and then when it reached 60, she was discharged. You're saying all of those evaluations and treatment was a sham? I'm saying the initial evaluation by Dr. O was a sham. I'm saying Dr. Seale made a decision to further confine her before she even met the plaintiff, because as the plaintiff testified, again, very consistently, the first words Dr. Seale said to her were, you are a very sick woman. Dr. Seale then said, I want you taking the medication prescribed by Dr. Mustafa. That means Dr. Seale was simply adopting the treatment regimen and the conclusions reached by Dr. Mustafa before she even conducted an evaluation of the patient. And then Ms. Rennie testified that after Seale made these statements, she again spent no more than ten minutes with her. So none of these, again, there was expert testimony that the conduct of all three defendant physicians substantially departed from professional standards. And that under Rodriguez v. City of New York makes clear, creates issues of fact that precludes summary judgment. Rodriguez is completely dispositive of the case at hand. Can I ask you about Drs. Onoogoo and Seale? Yes. So in order, if they exercise independent medical judgment, are they still state actors, or do they have to have just been implementing Dr. Mustafa's order? If they exercise independent medical judgment, then they're not state actors. Okay. So if they didn't exercise any independent medical judgment, in what way are they individually liable under the personal involvement prong of 1983? So let's assume they did not exercise any independent judgment, which makes them state actors potentially. Then don't we have a problem with sort of what is their individual liability then if they weren't actually doing anything but monitoring her progress in response to Dr. Mustafa's order? No, Your Honor, because they're the ones who signed the certificates that are required by law to effectuate the hospitalization. And were they doing that on their own, or were they doing that because Dr. Mustafa told them to? They were doing it on their own because they chose not to make an independent evaluation of the plaintiff and simply, I'll just say rubber-stamped the decision by Dr. Mustafa. And when we're looking at whether or not a reasonable jury could conclude that they were simply rubber-stamping the decisions of Dr. Mustafa, we have to look at the process of transfers of patients from Stony Brook to Brunswick, where over a 21-year period, every one of about 40,000 people sent from Stony Brook to Brunswick were found to meet the requirements. Can I ask, I mean, I guess I'm confused by the idea of just rubber-stamping. I mean, I get the idea that they didn't perform an evaluation that comported with the standard of care, but isn't it undisputed that they each conducted face-to-face evaluations and after that determined that she met the criteria for civil commitment? Well, Mustafa spent 10 minutes with her, looking up once, writing in his, copying stuff from whatever papers he had. Five of those minutes were spent talking about the plaintiff's desire to write a letter, leave the hospital. So that's five minutes talking about stuff. I would call that a rubber-stamp. And the plaintiff's expert affidavit explained why Dr. O could not have come close to making an informed decision within five minutes. Again, Dr. Seale says to the plaintiff upon meeting her, you're a very sick woman, this is the medication I want you to take. So could a reasonable jury infer that Dr. Seale simply rubber-stamped the decision by Dr. Mustafa? Particularly in light of that whole process of transferring patients from Stony Brook to Brunswick, I would say yes. Thank you, counsel. We'll hear from you more on rebuttal. We'll hear now, I think, from Ms. Goldberg, who represents, I believe, Dr. Mustafa. Thank you, Your Honor. Barbara Goldberg for defendant appellee Dr. Mustafa. I would like to point out that before Dr. Mustafa made her decision to have the patient transported to Brunswick, the patient had been evaluated by several medical professionals. After she was transferred to what we call the CPEP, the Comprehensive Psychiatric Emergency Program, she was evaluated by a nurse, she was evaluated by a student social worker, she was evaluated by the student under the supervision of a licensed social worker, and she was evaluated by a psychiatric resident, Dr. Kadiala. And each of these health care providers independently made notes that she expressed suicidal ideation, that she did say that she wanted to leave the earth. She made other comments to that effect. She did make a comment to the effect that she doesn't know how people live with this amount of pain in their face. And in that respect, I'd like to point out that she had a very, very painful parotid gland condition before this presentation to Stony Brook. She had been to a number of different providers, and no one was able to figure out what to do to relieve the pain that she was experiencing. And she actually said, even before this admission, that she believed that there was, quote, no end in sight for the pain that she was experiencing, and the district court specifically noted that. So can we talk about the affidavit? Two things about the affidavit. One, first question for you is, even if some statements we do find are inescapably and uncontrovertibly in tension with her deposition, first question is, even if some things are contradictory, does that mean we disregard the entire affidavit or only those contradictory statements? And the second question is, in what way is it really inescapably contradictory to the deposition testimony as opposed to an attempted explanation? In some places there are direct contradictions, but in many places it says, look, I said I don't know how people live with this. Let me tell you what I was thinking when I said that. Whether or not that's helpful to her case is a different question, but those are my two questions. Do we throw the whole thing out because of a few contradictions? And two, how do they meet the standard of that extreme standard of contradiction to warrant it? Your Honor, I think the answer to your first question is that we throw out the entire affidavit because it was not the obligation of the district court to go, I think there were like 94 paragraphs in the affidavit. It's not the obligation of the district court to parse this affidavit, compare it in every single respect to the deposition testimony. I think it's sufficient if there are many statements that are contradictory, and I submit that they are, and we have details. Can you tell us which ones those are? Which ones are unequivocal and inescapable? Well, I think that they are unequivocal because what she's doing is at her deposition she admitted that she says she does not know how people can live with such pain in the face, but denied telling anybody that she wanted to take her life as a result, and her affidavit goes on and embellishes this by adding the But in her affidavit she says, yeah, I discussed my frustration, and I said I don't know how people can live with it. That's not a contradiction that adds, as you said, an embellishment or an explanation. Well, I think, Your Honor, that the proper place and time for her to offer that explanation would have been at her deposition, but I think even more importantly, in the final analysis, what she says in her affidavit doesn't make any difference because the law is very, very clear, and I think this was alluded to during Mr. Brooks' argument. The law is clear that Dr. Mustafa's evaluation has to be made on the basis of what she knows, what she perceives, and the information that is available to her at the time, and all of these explanations are after-the-fact explanations. So I take it that there's this expert who is of the view that the evaluation that Dr. Mustafa conducted was not up to the standard of care because it was too brief and it didn't question the plaintiff about some of these statements on which Dr. Mustafa relied. So what are we to do if there's a dispute about the standard of care? It seems like that's a trial issue. Your Honor, I think that it's important to note that at his deposition, Dr. Stosny, who is the plaintiff's expert, made numerous concessions that there really was no malpractice here. For instance, he testified that Dr. Mustafa used clinical judgment when she stated that plaintiff posed a substantial risk of harm to herself, and she did so because a doctor's processing of information constitutes an exercise of clinical judgment. He also testified that he would not characterize Dr. Mustafa's decisions as, quote-unquote, plainly incompetent and could not assess a doctor's incompetence based on one case. And that's important. His concession that he couldn't characterize her decisions as plainly incompetent brings us into the realm of qualified immunity. Can you give us the page site for that? That would be really helpful. Yes. That's at page A988 to 989. Thank you, counsel. And his statement that the doctor's processing of information constitutes an exercise of clinical judgment is at pages A2988 to 2989. May I just – I see my light is – may I just – Yes. Carry on. Sorry. I just want to make a couple of other points, concessions made by Dr. Stosny, pages 8915 through 920. He acknowledged that Dr. Kadiala, who was the psychiatric resident, and Dr. Mustafa identified the facts and circumstances upon which Dr. Mustafa's determination was – that determining whether someone presents a substantial risk of harm to herself is a clinical judgment and that Dr. Mustafa made a clinical judgment that plaintiff represented a substantial risk of harm to herself. That's at pages 955 to 956. And I think that given these concessions, given the recorded statements in the record, these statements that are consistent with suicidal ideation, numerous examples throughout the record, the medical records pages 1547 to 1562, 1455 to 1457, 1474 to 1480, 1526 to 1529, and 1532 to 1535. And I think that given that Dr. Mustafa had an objectively reasonable basis, given all of these entries plus her own evaluation, even if it was only ten minutes, for believing that plaintiff suffered from depression and posed a danger to herself, qualified immunity applies here. Thank you very much, Your Honors. Okay, great. Thank you, Counsel. We'll hear from Mr. Del Piano for the other two doctors. Thank you, Your Honors. Good morning. May it please the Court, Michael Del Piano for the Brunswick defendants. The District Court was correct in determining that there was no state action on behalf of the Brunswick defendants in this case. As this Court has noted on multiple occasions over many years, private hospitals generally are not state actors for purposes of Section 1983 claims. There is no dispute in the record here that Brunswick Hospital is a private hospital, that Dr. O and Dr. Cial were private doctors, and this entire case brought by the plaintiffs hinges on this idea that they say that this was a sham evaluation done by Dr. O and Dr. Cial. But there's no case law to support that anywhere. As it shows in the plaintiff's own cases and in the case law that has been before this circuit before, the issue on whether there is a sham and adoption of the state actor's determination goes when there has been no evaluation whatsoever. That's the Bryant case, and in McGugin, that's really exemplified further where the plaintiff in question in that case was questioned while she was under sedation. Here, the plaintiff was examined by Dr. O, private physician. The plaintiff admits that that was an examination that took place. The plaintiff was then examined by Dr. Cial. That's an examination that the plaintiff admits took place. So it's clear that there was an examination done. Now, plaintiff has disagreement about the examination, but the fact that there was an examination done, whether it was 10 minutes or whether it was 50 minutes for Dr. O or 30 minutes and multiple times for Dr. Cial, really does not matter at this point because it knocks it out of being state action. Well, what if the examination is just an exercise? So the allegation is that Dr. Cial came to the examination not only having reviewed the existing records that seem to have, it feels like a little bit of a snowball effect of people repeating things that are in the record already, but if Dr. Cial comes to the initial examination with the plaintiff already having her mind made up, I'm sorry, I don't remember Dr. Cial's pronouns, but already having their mind made up, then is the physical presence of the doctor with the patient for 10 minutes meaningful? And how do we know whether there's any independent judgment exercise there? So the record doesn't reflect that Dr. Cial went in there with her mind made up already. The record reflects that Dr. Cial went into the examination, asked questions, reviewed documents, and then made a determination. To have a conclusory statement that this was just a sham because that allows the plaintiff to defeat summary judgment, that doesn't make it an undependent. I'm not making a conclusory statement and I didn't use the word sham. It's a genuine question. My genuine question to you, because I have not yet made up my mind, is are there things in the record that suggest that by the time Dr. Cial got to this case, there was so much produced by other parties along the way, other evaluators. Your colleague pointed out there were four evaluators in the ED and then there was Dr. Mustafa. There were all these pieces already. What is it about Dr. Cial's report, I guess I'll ask it this way, that should lead us to feel that it is an independent evaluation of this patient? Based on the record, as is presented before the court, Dr. Cial goes in, does the examination, makes the determination. And I wasn't suggesting that was your honor's conclusory statement. I'm suggesting it was the plaintiff's conclusory statement that there was no independent evaluation made. But at that point, Dr. Cial has an obligation to go in under the mental hygiene law, has an obligation to evaluate the plaintiff. That's what Dr. Cial does. That's what doctors do. There's nothing to indicate that the determination was not independent at that point. It's just self-serving to say that it had to be on the basis of what Dr. Mustafa said. And it would have to be on the basis of what Dr. Mustafa said in order for it to be any type of state action. Let me ask you a question. You just said something about, well, it's part of what doctors do to go in and conduct the face-to-face evaluation. Is part of what doctors do also to read the medical record? Yes. And I take it that if a doctor didn't read the prior physician's treating doctor's records, one might say, well, that might be below the standard of care. You have to know what the complaint is, what the issues are before you go in to see the patient. I mean, certainly when you go to the doctor these days, you fill out like a 20-page questionnaire. You hope they read it, right, before you go in to see them. And so my question is, is the fact that these doctors are reading each other's notes or referencing each other's notes in and of itself suggestive that it's a sham? No, I think you're exactly on point, Your Honor. The doctor is required to look at the medical history of somebody that they're going to examine and make a determination on. And under these circumstances, it would have been inappropriate for Dr. Seale to not look at that in conjunction with doing the evaluation of the plaintiff when the evaluation was conducted. So the idea that someone looks at medical records does not convert this into a sham. And the idea that it follows state action does not somehow convert private action into state action. I see my time is running up. We ask that the district court opinion be affirmed. Thank you. Thank you, counsel. And Mr. Brooks will hear your rebuttal. All right, let me go down in order, Your Honor. First, the plaintiff never said that she wanted to leave this earth. What she said was, I would have never said I would want to leave this earth because it conflicts with my religious values. Next, there are no inescapable contradictions between the plaintiff's affidavit testimony and her depositions. None. Certainly not as to any important matters, and defendants have not cited any. Where we have inescapable contradictions are between the plaintiff's affidavit and deposition and what's in the medical records. Next, Defendant Mustafa says the plaintiff's place to offer an explanation as to what she meant was in her deposition. This court has made clear a party is allowed to elaborate on what was said at a deposition. This court has said it time after time, and those cases are in the appellant's brief. It is not the party's job to elaborate on what she means at a deposition. It's the party's job to simply answer the questions of the opposing party. If the opposing counsel does not ask questions that draw out answers, then it's not the plaintiff's job to do the job of opposing counsel. Dr. Stasny, the plaintiff's expert, never said that Defendant Mustafa acted in a competent manner. He was asked about whether or not he thought Defendant Mustafa was competent, and he said, I don't know. I'm only judging on what was said here, or what was done here. And in this case, Mustafa acted in a plainly incompetent manner. In his affidavit, Stasny testified as to what he meant by saying Mustafa exercised clinical judgment. Yes, he acknowledged that she did, but he said the clinical judgment exercised in this case substantially departed from professional standards. Principal counsel said there is no case law to support the plaintiff's position regarding state action. There is unanimous district court authority that says when physicians fail to exercise independent medical judgment, they engage in state action. The Brunswick Hospital did not controvert this line of authority or attempt to challenge it in any way. As to Defendant Seau, as to what Seau knew or did, we don't know. But this is a summary judgment motion where we have to take the plaintiff's word as to what she said, particularly when it's consistent with her deposition testimony. And she said, Dr. Seau made the statement at the very beginning that when they first met, you were a very sick woman. We don't know what Dr. Seau read. We don't know what she wrote in her records were based upon a personal evaluation or simply copied. As the amicus pointed out, clinicians often copy records and cut and paste. So we don't know any of this. There is no independent indicious such as an audio tape or a videotape as to what happened. Is what the plaintiff testified credible? Absolutely. She submitted a 19-page affidavit that went into significant factual detail that was completely consistent with her deposition testimony. And there was no reason not to consider it. Thank you, Counsel. We have your argument. Thanks to all three of you. We'll reserve decision.